**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

CSX TRANSPORTATION, INC.,

        Plaintiff,

v.                                      Case No.: 3:26-cv-1795-WWB-SJH

INTERNATIONAL ASSOCIATION OF
SHEET METAL, AIR, RAIL, AND
TRANSPORTATION WORKERS-
TRANSPORTATION DIVISION
(SMART-TD),

        Defendant.

_____/

## <u>ORDER</u>

THIS CAUSE is before the Court on Plaintiff's Renewed Time-Sensitive Motion for Temporary Restraining Order and/or Preliminary Injunction (Doc. 13). Stated generally, Plaintiff seeks to restrain Defendant and its officers, agents, employees, and members from engaging in or encouraging any strike, work stoppage, planned slowdown, or other form of self-help in response to Plaintiff's newly implemented Attendance Policy. (*Id.* at 2–3, 26; *see also* Doc. 1, ¶ 16; Doc. 2-1 at 3–4). Plaintiff claims that Defendant plans to strike or engage in other forms of disruptive self-help unless Plaintiff rescinds the Attendance Policy by July 15, 2026. (Doc. 1, ¶¶ 27, 29; Doc. 13 at 2).

## I.    BACKGROUND

Plaintiff, CSX Transportation, Inc. ("**CSXT**"), is a common carrier by railroad and operates a railroad system spanning approximately 20,000 miles throughout the United States and Canada. (Doc. 1, ¶ 2). Defendant, International Association of Sheet Metal, Air, Rail, and Transportation Workers-Transportation Division ("**SMART-TD**"), represents

trainmen, conductors, yardmen, and other classes of employees as a labor union.  (*Id.* ¶ 3).  Plaintiff's Attendance Policy ("**Policy**," Doc. 3-2) assesses points to employees for certain absences.  (Doc. 1, ¶ 11).  The number of points assessed after an absence depends on the reason for the absence.  (*Id.*).  In some instances, the number of points assessed can be reduced by providing medical documentation.  (*Id.*; *see also* Doc. 3-2 at 4).  Some absences—such as those resulting from FMLA leave—never result in an assessment of points. (Doc. 1, ¶ 11).  Eventually, though, an employee who accumulates sixty or more points can be disciplined, including by termination.  (*Id.* ¶¶ 11, 20; *see also* Doc. 3-2 at 6).  Plaintiff maintains other routes for enforcing attendance-related issues.  Pursuant to its disciplinary policy Plaintiff has, for example, "disciplined and even dismissed employees for taking FMLA leave dishonestly even though the absences in those cases did not result in attendance points."  (Doc. 1, ¶ 19).

Plaintiff's Policy was not implemented as part of any collective bargaining agreement when it became effective January 1, 2023.  (Doc. 1, ¶ 13).  "However, in April 2023, as part of a broader agreement, the parties agreed to 'adopt the CSX Attendance Policy in effect as of January 1, 2023, . . . subject to the terms for implementation, application, interpretation and intent as established by CSX as of the date of th[e] Agreement.'"  (*Id.* (quoting Doc. 3-5 at 4–5)).

Plaintiff "allow[s] employees to mark off [absences] for short-term illness, scheduled medical appointments, emergency treatment and hospitalization through something called the T&E Portal – an application that can be accessed through the employee's Company-issued iPad."  (*Id.* ¶ 15).  On June 30, 2026, Plaintiff issued a system-wide ("**Notice**") concerning an update to the T&E Portal.  (*Id.* ¶ 16).  The Notice

2

also clarified Plaintiff's interpretation of certain terms under the Attendance Policy. (*Id.* ¶ 17). For instance, the Policy provides that "[e]mployees who choose to submit medical documentation to support absences related to hospitalization, emergency treatment or scheduled medical appointments for themselves or family members must provide the CSX Medical Department with the following information within three (3) calendar days of marking up for service[.]" (Doc. 3-1 at 4). However, the terms "hospitalization," "emergency treatment," "scheduled medical appointment[]," and "family member[]," are undefined in the Policy itself. (*See id.*; Doc. 1, ¶¶ 14, 17). Plaintiff's Notice provided the following definitions:

> Hospitalization means being admitted to a hospital on an inpatient basis for treatment or observation for care that cannot be provided in an outpatient facility. Treatment provided at a hospital emergency room/department or commercial or other urgent care facility on an outpatient basis is not considered hospitalization.
>
> Emergency treatment is immediate medical care provided to a person who has an unforeseen sudden illness, injury or condition that could seriously endanger their health, life, organs or bodily functions, in order to stabilize the patient, prevent the condition from worsening and address life-threatening problems.
>
> Scheduled medical appointment means an appointment, generally in person and occurring at a health care facility, which is scheduled with the health care provider in advance of the mark off, and notified to CSX through the T&E Portal in advance of the mark off. This does not include an employee marking off without prior notice and then subsequently seeking diagnosis or treatment, and does not include appointments not scheduled in advance of the mark off and with prior notice to the appropriate CSX representative. "Teladoc" and most virtual or remote consultations are not considered scheduled medical appointments.

(Doc. 3-6 at 8 (titles and some paragraph breaks omitted)). Additionally, the Notice stated that "family member" meant only an employee's "Spouse, Son, Daughter [or] Parent (not in-law)." (*Id.* at 3). The Notice also "reminded employees that '[e]mployees who incur

3

excessive absences under suspicious circumstances, or patterns and degrees of unavailability that indicate abuse or misuse of CSX policies are subject to discipline up to and including dismissal regardless of accumulated points.'" (Doc. 1, ¶ 19 (quoting Doc. 3-6 at 11).

Plaintiff shared a draft of the Notice with Defendant's general committees of adjustment—"local administrative bodies responsible for negotiating and maintaining collective bargaining agreements under their jurisdiction." (Doc. 1, ¶¶ 4, 21). The draft resulted in significant pushback over what Defendant perceived as the Notice's overly restrictive definitions and two-tiered attendance system. (*Id.* ¶ 21). One committee representative formally objected that the Notice "contain[ed] numerous new substantive restrictions, conditions, eligibility requirements, definitions, and disciplinary standards that d[id] not exist within the [Policy]." (Doc. 3-11 at 3). He also warned that, should the Notice be issued, Defendant would view it as "an unlawful unilateral modification of the parties' Collective Bargaining Agreement in violation of the Railway Labor Act." (Doc. 3-11 at 12; *see also* Doc. 1, ¶ 21).

Plaintiff nonetheless issued the Notice, believing the objection was meritless. (Doc. 1, ¶ 22). The parties continued to discuss Defendant's objection and attempted to resolve the dispute but to no avail. (*Id.* ¶¶ 23–25; *see also generally* Doc. Nos. 3-10, 3-11). In the face of escalating warnings that Plaintiff perceived as prefiguring a strike, Plaintiff sought reassurance that Defendant would "refrain from any actions that disrupt, delay, or interfere with [] normal railroad operations." (Doc. 1, ¶ 26). In return, Defendant assured Plaintiff that it would "use every lawful means available to preserve the negotiated status quo" unless the Notice was rescinded by July 15, 2026. (*Id.* ¶ 27).

4

When asked directly whether Defendant would engage in "self-help [] to disrupt [Plaintiff's] operations" in the event of non-rescission, Defendant replied, "Absolutely." (*Id.* ¶ 29 (quotation marks omitted)). Thereafter, Plaintiff initiated the instant action seeking declaratory and injunctive relief under the Railway Labor Act ("**RLA**"), 45 U.S.C. § 151 *et seq*. (*See generally* Doc. 1).

## II.    LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 65(b), a district court may issue a temporary restraining order "without written or oral notice to the adverse party" if the requesting party provides "specific facts . . . [that] clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition." To obtain a temporary restraining order, the movant must establish: "(1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered if the relief is not granted; (3) that the threatened injury outweighs the harm the relief would inflict on the non-movant; and (4) that entry of the relief would serve the public interest." *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1225–26 (11th Cir. 2005). Additionally, the moving party must present facts and evidence stating why "notice is impractical." M.D. Fla. R. 6.01(b)(2).

## III.    DISCUSSION

As an initial matter, Plaintiff concedes that the Norris LaGuardia Act ("**NLGA**"), 29 U.S.C. § 101 *et seq.*, generally prohibits courts from issuing injunctions related to labor disputes. *See, e.g.*, *Int'l Ass'n of Machinists v. Street*, 367 U.S. 740, 772 (1961) (stating that the NLGA "expresses a basic policy against the injunction of activities of labor unions"). Specifically, 29 U.S.C. § 104 divests courts of "jurisdiction to issue any

5

restraining order or temporary or permanent injunction . . . prohibit[ing a] person or persons" involved in a labor dispute from striking, i.e., "[c]easing or refusing to . . . work," or engaging in other union-related activities. However, "specific provisions of the [RLA] take precedence over the more general provisions of the [NLGA]." *Bhd. of R.R. Trainmen v. Chi. River & Ind. R.R. Co.*, 353 U.S. 30, 42 (1957). As relevant here, both § 152 First and § 153 First qualify for this exception. *See Delta Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l*, 238 F.3d 1300, 1306 (11th Cir. 2001); *Pro. Airline Flight Control Ass'n v. Spirit Airlines, Inc.*, 65 F.4th 647, 652 (11th Cir. 2023); *cf. CSX Transp., Inc. v. Bhd. of Maint. of Way Emps.*, 327 F.3d 1309, 1327 (11th Cir. 2003) ("[O]n a general basis, injunctive relief is the first resort of courts when a union and carrier come before the court with an impending illegal strike threatening to disrupt carrier service.").

However, "the general procedural provisions of the NLGA still apply to this action, even though the anti-injunction portion of the NLGA does not." *Delta Air Lines*, 238 F.3d at 1310; *see also Aircraft Serv. Int'l, Inc. v. Int'l Bhd. of Teamsters*, 779 F.3d 1069, 1074 (9th Cir. 2015) ("The relationship between the RLA . . . and the NLGA . . . has always been somewhat unclear."). The Court has reviewed those provisions, *see* 29 U.S.C. §§ 107–109, and finds them satisfied, though the Court notes one limit that bears on Plaintiff's requested relief: "a temporary restraining order shall be effective for no longer than five days and shall become void at the expiration of said five days." 29 U.S.C. § 107. Should Plaintiff contend this provision is inapplicable, it may seek to amend, by way of a motion no longer than seven pages, the Temporary Restraining Order issued herein.

### A. Likelihood of Success

In Count I, Plaintiff alleges that the "strike, work stoppage, or other self-help [threatened] by Defendant . . . are unlawful and should be enjoined" pursuant to the RLA. (Doc. 1, ¶ 41). "The RLA distinguishes between two types of disputes in labor relations—major and minor." *CSX Transp.*, 327 F.3d at 1320. Major disputes concern "the formation of collective agreements" and "arise [either] where there is no such agreement or where it is sought to change the terms of one, and therefore the issue is not whether an existing agreement controls the controversy." *Consol. Rail Corp. v. Ry. Lab. Executives' Ass'n* ("**Conrail**"), 491 U.S. 299, 302 (1989) (quotation omitted). By contrast, minor disputes concern "the interpretation or application of [already existing] agreements concerning rates of pay, rules, or working conditions." *Id.* at 303 (quotation omitted). Generally, then, "major disputes seek to create contractual rights, [while] minor disputes [seek] to enforce them." *Id.* at 302. "If a dispute is 'minor' the parties are prohibited from striking and must submit to compulsory arbitration of the dispute by the [National Railroad Adjustment Board ("**NRAB**")]." *CSX*, 327 F.3d at 1320.

"Where an employer asserts a contractual right to take the contested action, the ensuing dispute is minor if the action is arguably justified by the terms of the parties' collective-bargaining agreement." *Conrail*, 491 U.S. at 307. "Additionally, if a reasonable doubt exists as to whether the dispute is major or minor, [courts] will deem it to be minor." *CSX*, 327 F.3d at 1321 (quotation omitted). Therefore, the party "argu[ing] that a dispute is minor—typically the carrier—has only a 'light' burden of proof." *Spirit Airlines*, 65 F.4th at 653 (quoting *Conrail*, 491 U.S. at 307). On the record before the Court, this case presents a minor dispute.

7

Issuance of the Notice and the terms provided therein were both arguably justified by the parties' existing bargaining agreement, which adopts Plaintiff's Policy. The Policy provides certain rules and standards concerning absences caused by the hospitalization, emergency treatment, or scheduled medical appointment of an employee or an employee's family member, but these terms are undefined. The Notice defines them. In objecting to the Notice, Defendant stressed that it contained new substantive restrictions, conditions, eligibility requirements, definitions, and disciplinary standards that are not within Plaintiff's Policy and therefore not within the parties' bargaining agreement. Plaintiff maintains that the Policy and thus the bargaining agreement do not prohibit the interpretation of ambiguous language therein. It follows that the "nature of the dispute . . . depend[s] on the existence and interpretation" of the bargaining agreement, or Policy. *CSX*, 327 F.3d at 1322. Resolving such issues presents a minor dispute. In a major dispute, by contrast, "the issue is not whether an existing agreement controls the controversy," since major disputes "look to the acquisition of rights for the future, not to assertion of rights claimed to have vested in the past." *Conrail*, 491 U.S. at 302 (quotation omitted).

Nor is Plaintiff's position so "frivolous or [] insubstantial" as to warrant the finding of a major dispute. *Id.* at 307. The Court recognizes that the parties' bargaining agreement "adopt[ed] the CSX Attendance Policy in effect as of January 1, 2023, . . . subject to the terms for implementation, application, interpretation and intent as established by CSX as of the date of th[eir April 2023] Agreement.'" (Doc. 3-5 at 4–5; *see also* Doc. 1, ¶ 13). However, that the bargaining agreement was adopted subject to Plaintiff's contemporaneous interpretation does not expressly prohibit Plaintiff's or

8

Defendant's subsequent interpretation of arguably ambiguous terms.  To the extent it *impliedly* prohibits such action, resolution still flows through interpretation of the bargaining agreement (or Policy).  Plaintiff has shown that at least a reasonable doubt remains in favor of its position, and the Court is not concerned with determining whether Plaintiff's interpretation is correct.  *CSX*, 327 F.3d at 1322 (citing *Conrail*, 491 U.S. at 306).

### B. Other Factors

Citing *Conrail*, Plaintiff argues that it need not meet the traditional standard for obtaining injunctive relief.  *See* 491 U.S. at 303 ("[D]istrict courts have subject-matter jurisdiction to enjoin a violation of the status quo pending completion of the required procedures, without the customary showing of irreparable injury.").  However, this statement seems to have applied "[i]n the event of a major dispute." *Id.* at 302.  Thus, as the Eleventh Circuit has put it, "[t]he [NRAB] has exclusive jurisdiction over a minor dispute" with "a limited exception: district courts may issue a status-quo injunction if needed to preserve the [NRAB's] jurisdiction by preventing [irreparable] injury."  *Spirit Airlines*, 65 F.4th at 652 (quotation omitted).  Moreover, while the NLGA normally requires "live testimony with opportunity for cross-examination" prior to the issuance of an injunction, a temporary restraining order may be issued on "sworn affidavits . . . if the complainant would suffer 'substantial and irreparable injury' without the TRO."  *Delta Air Lines*, 238 F.3d at 1305–06 (quoting 29 U.S.C. § 107).

Plaintiff alleges in its Verified Complaint that it employs over 22,000 workers over 20,000 miles of railway track across twenty-six states and two Canadian provinces.  (Doc. 1, ¶ 30).  Therefore, any disruption to its operation would have serious impacts on

interstate and international commerce. (*See id.*). Plaintiff alleges that "[e]ven a temporary work stoppage by Defendant . . . could lead to critical energy shortages and the loss of thousands of jobs in industries serviced by CSXT that would be both immediate and that would continue to ripple throughout the economy for months into the future." (*Id.* ¶ 31). The Court is satisfied that these potential economic injuries are materially unquantifiable. Furthermore, Plaintiff alleges that a strike would deprive it of full use of its tracks, facilities, and equipment, causing an otherwise unrecoverable loss of revenue and putting non-striking employees out of work for the duration of the strike. Plaintiff swears that it has attempted to obtain reassurances that Defendant would not strike or disrupt operations, but that Defendant has not only refused but also affirmatively acknowledged its intent to engage in self-help and disrupt Plaintiff's operations if the notice is not rescinded. (Doc. 3-1 at 6–9). The Court finds that Plaintiff has made a requisite showing of irreparable harm.

So too has Plaintiff shown that a strike would harm the public. Plaintiff alleges that its traffic interchanges with other rail carriers and their respective rail systems. Because service to those carriers and downstream consumers will be affected by a work stoppage, the public interest accordingly favors the entry of a temporary restraining order. (*See* Doc. 1, ¶ 31 (Plaintiff's essential shipments include "coal needed by coal-fired power plants, fertilizers and other products needed for agricultural production, chemicals required to produce potable water, and mail"); *cf. Bhd. of Maint. of Way Emps. v. Atchison, Topeka & Santa Fe Ry. Co.*, 138 F.3d 635, 638 (7th Cir. 1997) ("A strike that halted traffic along [railroads or airlines] could traumatize the nation's economy."). By contrast, Defendant will suffer no harm from being restrained against an unlawful strike. *See*

*Conrail*, 491 U.S. at 310 n.8 ("In most cases where the [NRAB] determines that the employer's conduct was not justified by the contract, the Board will be able to fashion an appropriate compensatory remedy which takes account of the delay.").

### C. Notice and Bond

Notice of this action and the relief requested has been provided to Defendant.  (*See* Doc. 13-1 at 1–2).  Moreover, Plaintiff alleges and swears that a strike or disruption is threatened to commence unless it rescinds its Notice today, July 15, 2026.  Conducting a hearing before the deadline is, therefore, neither practical nor possible.

Plaintiff also seeks to post a nominal bond.  The NLGA requires the party granted a temporary restraining order to post

> adequate security in an amount to be fixed by the court sufficient to recompense those enjoined for any loss, expense, or damage caused by the improvident or erroneous issuance of such order or injunction, including all reasonable costs (together with a reasonable attorney's fee) and expense of defense against the order or against the granting of any injunctive relief sought in the same proceeding and subsequently denied by the court.

29 U.S.C. § 107.  A nominal bond is inadequate security for all reasonable costs and expenses of defense, and courts routinely set six-figure bonds when granting a carrier's request for a status quo injunction.  *See Atlas Air, Inc. v. Int'l Bhd. of Teamsters*, 280 F. Supp. 3d 59, 106 (D.D.C. 2017), *aff'd,* 928 F.3d 1102 (D.C. Cir. 2019); *BNSF Ry. Co. v. Int'l Ass'n of Sheet Metal, Air, Rail & Transp. Workers – Transp. Div.*, No. 4:22-cv-0052, 2022 WL 350727, at *2 (N.D. Tex. Jan. 25, 2022).  Bond will be set at $200,000, but the Court invites further filings should either party seek to modify the amount.

## IV.    CONCLUSION

Accordingly, it is **ORDERED** and **ADJUDGED** that Plaintiff's Renewed Time-Sensitive Motion for Temporary Restraining Order and/or Preliminary Injunction (Doc. 13) is **GRANTED** to the extent provided herein and the following Temporary Restraining Order is entered as to Defendant SMART-TD:

### TEMPORARY RESTRAINING ORDER

For the reasons set forth above, it is **ORDERED** that Defendant SMART-TD, its divisions, lodges, locals, officers, agents, employees, members, and all persons acting in concert or participation with any of them, are hereby restrained for the duration of this Order from authorizing, encouraging, permitting, calling, engaging in, or continuing any strikes, work stoppages, picketing, slowdowns, sickouts, or other self-help against Plaintiff or its operating rail subsidiaries over any dispute relating to the interpretation of CSXT's Attendance Policy and other aspects of System Notice 502.

Defendant SMART-TD and its national and local officers shall immediately initiate and undertake all reasonable efforts to prevent and discourage SMART-TD's divisions, lodges, locals, officers, agents, employees, members, and all persons acting in concert with any of them, from engaging in conduct enjoined by this Order and Temporary Restraining Order, including but not limited to the following specific efforts:

1. Immediately instruct in writing all SMART-TD members employed by Plaintiff to refrain from self-help against Plaintiff, and provide Plaintiff with a copy of all such instructions;

2. Notify all SMART-TD members employed by Plaintiff by the most expeditious means possible of the issuance, contents, and meaning of this Order and

12

Temporary Restraining Order, and provide Plaintiff with a copy of all such notices;

3. Include in such notice a directive from SMART-TD to those SMART-TD members who are or may in the future engage in any conduct enjoined by this Order and Temporary Restraining Order to immediately cease and desist all such activity and to immediately cease and desist all exhortations or communications encouraging same upon pain of fine, suspension, or other sanction by SMART-TD;

4. Invoke union discipline and punish individual officers, agents, employees, or members who engage in any conduct enjoined by this Order and Temporary Restraining Order;

5. Include copies of this Order and Temporary Restraining Order in all SMART-TD publications, post it on all SMART-TD bulletin boards at Plaintiff's facilities, and transmit the contents of the ordering paragraphs on any recorded telephone hotlines, web sites, or other methods of electronic communication used by SMART TD to communicate with its represented employees;

6. Contemporaneously furnish all copies and other materials required to be furnished to Plaintiff to the Court; and

7. To report to the Court by **July 17, 2026**, by sworn affidavit or declaration, the steps SMART-TD has taken to comply with this Order and Temporary Restraining Order.

**IT IS FURTHER ORDERED** that this Order and Temporary Restraining Order is granted upon the condition that an undertaking in the sum of $200,000, or cash in that

amount, be filed within **two business days** from the time and date of this Order and Temporary Restraining Order to make good such damages not to exceed said sum as may be suffered or sustained by anyone who is found to be wrongfully restrained.

This Temporary Restraining Order shall continue until **July 20, 2026, at 3:00 p.m.**

Plaintiff shall serve a certified copy of this Order and Temporary Restraining Order, in lieu of a formal notice, upon the Defendant on or before midnight.  For the purpose of providing for service of notice of this injunction, in addition to the methods of service of process provided by statute, notice may be given to Defendant SMART-TD, its members, and all other persons by the posting of copies of this injunction at the entrances of the Plaintiff's premises, which shall be considered prima facie evidence of notice and knowledge of this injunction to and by all persons who may commit, or attempt to commit, any act or acts in violation thereof at or near the said premises of the Plaintiff.

Defendant shall file a response to Plaintiff's Renewed Time-Sensitive Motion for Temporary Restraining Order and/or Preliminary Injunction on or before **10:00 a.m. on July 17, 2026**.

On or before **4:00 p.m. on July 17, 2026**, the parties shall file a joint notice, not to exceed ten pages, informing this Court if a hearing is necessary in this matter.  Any party requesting an evidentiary hearing shall: (1) identify with particularity all disputed issues of material fact or credibility determinations that are expected to impact the resolution of the Motion; (2) the names of any witnesses that the party anticipates calling at a hearing; and (3) the estimated length of the requested hearing.

**DONE AND ORDERED** in Jacksonville, Florida on July 15, 2026.

14

WENDY W. BERGER
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record

15