**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

CSX TRANSPORTATION, INC.,

Plaintiff,

v. Case No.: 3:26-cv-1795-WWB-SJH

INTERNATIONAL ASSOCIATION OF SHEET METAL, AIR, RAIL, AND TRANSPORTATION WORKERS-TRANSPORTATION DIVISION (SMART-TD),

Defendant.
_________________________________/

**ORDER**

THIS CAUSE is before the Court on Plaintiff's Renewed Time-Sensitive Motion for Temporary Restraining Order and/or Preliminary Injunction (Doc. 13), Defendant's Motion for Preliminary Injunction (Doc. 33), and the Responses and Replies (Doc. Nos. 27, 35, 36) thereto. An evidentiary hearing was held on July 28, 2026. For the reasons set forth below, Plaintiff's Motion will be granted and Defendant's Motion will be denied.

## I. BACKGROUND

Plaintiff, CSX Transportation, Inc. ("**CSXT**"), is a common carrier by railroad and a "carrier" within the meaning of the Railway Labor Act ("**RLA**"), 45 U.S.C. § 151 First. (Doc. 1, ¶ 2; DA, ¶ 2).[1] Plaintiff engages in interstate commerce and operates a railroad system spanning approximately 20,000 miles throughout the United States and Canada. (Doc.

[1] The Court will distinguish between paragraphs included Defendant's Answer and Verified Counterclaim (Doc. 32) by referencing either the Answer ("**DA**") or the Counterclaim ("**DC**").

1, ¶ 2; DA, ¶ 2). Defendant, International Association of Sheet Metal, Air, Rail, and Transportation Workers-Transportation Division ("**SMART-TD**"), represents trainmen, conductors, yardmen, and other classes of employees as a labor union, and is a "representative" within the meaning of the RLA, 45 U.S.C. § 151 Sixth. (Doc. 1, ¶ 3; DA, ¶ 3). Defendant has "local administrative bodies responsible for negotiating and maintaining collective bargaining agreements under their jurisdiction," which are called "General Committees of Adjustment" ("**GCA**"). (Doc. 1, ¶ 4; DA, ¶ 4).

Plaintiff and Defendant are co-parties to a number of collective bargaining agreements that vary in scope and domain. (Doc. 1, ¶ 7; DA, ¶ 7). The agreements contain "implied terms" that are supplied by past practice. (Doc. 1, ¶ 7; DA, ¶ 7).

Plaintiff implemented its Craft Attendance Policy ("**Attendance Policy**" or "**Policy**," Doc. 3-2) on January 1, 2023, without negotiation. (Doc. 1, ¶¶ 11, 13; DA, ¶¶ 11, 13). The Policy assesses points to employees for certain absences. (Doc. 3-2 at 3–5). The number of points assessed after an absence depends on the reason for the absence and can sometimes be reduced by providing medical documentation. (*Id.* at 4). The Policy provides for a five-point assessment when an employee marks off from work for a short-term illness.[2] (*Id.*). No points are assessed for absences due to the "hospitalization, emergency treatment[,] or scheduled medical appointment[]" of an employee or family member, so long as the employee provides adequate "medical documentation" "within three [] calendar days of marking up for service." (*Id.* at 2, 4). An employee who

[2] By "marking off" for service, an employee indicates he is unavailable, and by "marking up for service," an employee indicates he is available. (Doc. 1, ¶ 9; *see* Doc. 35-8 at 2–3). Defendant denies that employees must always mark "up" or "off" from work, alleging that employees remain available as a default and are automatically marked off for vacations and personal leave. (DA, ¶ 9).

accumulates sixty or more points can be disciplined, including by termination, but an employee with less than sixty points "will not be subject to discipline or dismissal." (*Id.* at 2; *see also id.* at 6).

In April 2023, the parties amended the collective bargaining agreements ("**CBA**") governing Plaintiff's Northern Mid-Atlantic District. (Doc. 1, ¶ 13; DA, ¶ 13). Specifically, Section 3 of the amendments provided that the Attendance Policy would be adopted into the CBAs "subject to the terms for implementation, application, interpretation and intent as established by CSX as of the date of th[e amendment]." (Doc. 33-1 at 22–23). In August 2023, the parties agreed to incorporate the Policy into a second collective bargaining agreement governing Plaintiff's Consolidated Southern Region. (DC, ¶ 19; Doc. 34, ¶ 19). Again, the Policy was adopted "subject to the terms for implementation, application, interpretation and intent as established by CSX as of the date of th[e] Agreement." (Doc. 33-2 at 11).

On June 30, 2026, Plaintiff issued System Notice 502 ("**Notice**" or "**Notice 502**," Doc. 3-6) after sharing a draft with Defendant's General Chairmen earlier in the morning. (DC, ¶¶ 32–33; Doc. 34, ¶¶ 32–33). For the purposes of Plaintiff's Attendance Policy, the Notice defined a scheduled medical appointment as

> an appointment, generally in person and occurring at a health care facility, which is scheduled with the health care provider in advance of the mark off, and notified to CSX through the T&E Portal in advance of the mark off. This does not include an employee marking off without prior notice and then subsequently seeking diagnosis or treatment, and does not include appointments not scheduled in advance of the mark off and with prior notice to the appropriate CSX representative. "Teladoc" and most virtual or remote consultations are not considered scheduled medical appointments.

(Doc. 3-6 at 8). The Notice further stated that "[e]mployees who incur excessive absences, absences under suspicious circumstances, or patterns and degrees of

unavailability that indicate abuse or misuse of CSX policies are subject to discipline up to and including dismissal regardless of accumulated points." (*Id.* at 11).

Richard Lee, Chairman of Defendant's GCA for the Northern Mid-Atlantic District, formally objected to the draft Notice, arguing that it added numerous "new substantive conditions, restrictions, and disciplinary standards" to the Policy. (Doc. 3-11 at 4; *see also* Doc. 1, ¶ 21; DA, ¶ 21). Thus, according to Lee, implementing the Notice would constitute "an unlawful unilateral modification of the parties' Collective Bargaining Agreement" in violation of the RLA. (Doc. 3-11 at 12).

In the following days, the parties continued to discuss the Notice and Lee's objections but failed to resolve their dispute. (Doc. 1, ¶¶ 23–25; DA, ¶¶ 23–25; *see generally* Doc. Nos. 3-10, 3-11). Plaintiff perceived some of Lee's communications as prefiguring a strike and contacted Jeremy Ferguson, Defendant's President, seeking confirmation that Defendant would "cease and desist from engaging in . . . work stoppages, sick-outs, misuse of statutory leave, slowdown campaigns, concerted refusals to accept assignments or overtime, or other concerted refusals to perform work in a timely and efficient manner consistent with past practice." (Doc. 3-12 at 2). Ferguson, however, agreed with Lee after "thorough[] review[]" of relevant documents and the parties' past correspondence. (Doc. 3-13 at 2). Thereafter, Plaintiff initiated the instant action seeking declaratory and injunctive relief and moved to temporarily restrain and preliminarily enjoin Defendant and its officers, agents, employees, and members from engaging in or encouraging any strike, work stoppage, planned slowdown, or other form of self-help in response to Plaintiff's newly implemented Attendance Policy. (*See generally* Doc. Nos. 1, 13). The Court granted Plaintiff's Motion to the extent it sought a temporary restraining

order. (*See generally* Doc. 18). Defendant filed a Counterclaim and moved to preliminarily enjoin Plaintiff from enforcing or implementing Notice 502. (Doc. 32 at 13–26; *see generally* Doc. 33).

## II. FINDINGS OF FACT

At the evidentiary hearing on the cross-Motions for Preliminary Injunction, Plaintiff presented the testimony of Jeffery Wall, its Vice President of Labor Relations, and Jennifer Manz, its Director of Labor Relations and the highest designated officer for resolving labor disputes on properties relevant to this litigation. Defendant presented the testimony of Jamie Modesitt, its International Vice President, and Richard Lee. Based on the testimony and evidence submitted by the parties,[3] the Court makes the following findings of fact applicable to its ruling on the Motion for Preliminary Injunction:

### A. Alternative Routes to Disciplinary Action

Plaintiff's Attendance Policy established a non-punitive, point-based attendance system, which allows Plaintiff and its employees to track absences. The Policy requires an employee to accumulate sixty points before facing disciplinary action. (Doc. 3-2 at 2, 6). Notice 502 states that "[e]mployees who incur excessive absences . . . are subject to discipline up to and including dismissal regardless of accumulated points." (Doc. 3-6 at 11). However, as a matter of custom, past practice, and formal policies, Plaintiff has maintained routes for enforcing attendance-related issues that fall outside of its Attendance Policy. Plaintiff has disciplined and even dismissed employees for dishonestly taking leave or demonstrating suspicious patterns of absences, even though

[3] The Court relies primarily on the testimony and exhibits offered at the July 28, 2026 evidentiary hearing. However, where applicable, the Court cites to evidence by reference to Court's electronic filing system.

the absences in those cases did not result in attendance points. (*See generally* Doc Nos. 3-9, 35-2, 35-3, 35-4, 35-5, 35-6). By denying that these cases presented attendance-related issues, Defendant effectively concedes that they fell outside of the Attendance Policy. (*Compare* Doc. 1, ¶¶ 18–20, *with* DA, ¶ 19). Defendant can and does challenge these disciplinary decisions but has never threatened to strike over them.

**B. Pre-Scheduling of Medical Appointments**

The Attendance Policy expressly provides for a reduction of points (to zero), subject to the employee's timely submission of certain records, for absences resulting from an employee's scheduled medical appointment. (Doc. 3-2 at 4). Notice 502 provides that scheduled medical appointments are those that are "scheduled with the health care provider in advance of the mark off." (Doc. 3-6 at 8). Plaintiff included this language to better differentiate between absences for scheduled medical appointments and mark-offs for short-term illnesses. With respect to scheduled medical appointments, Plaintiff anticipates that employees will be able to pre-schedule certain routine medical appointments, such as those for preventative care. With respect to mark-offs for short term illnesses, however, Plaintiff does not expect employees to predict when they will become ill in order to pre-schedule an appointment.

Plaintiff maintains a practice of excusing the attendance points which, under the Policy's express terms, would normally result from an employee's mark-off for a short-term illness, provided the absence is supported by documentary proof of a medical appointment. Plaintiff agreed to this practice in an exchange. In return, Defendant agreed to delay challenging point assessments until an employee was actually subject to discipline, and therefore ceased conducting individualized investigations into, and

hearings on, every incident in which points were assessed. Defendant's concession was written into the Policy. (*See* Doc. 3-2 at 2–3). Conversely, Plaintiff's concession became an implied term of the Policy.

Plaintiff operates its practice of excusing points for short-term illnesses regardless of whether the employee's appointment was scheduled prior to his mark-off. Notice 502 neither prohibits nor institutes a mandatory change to the practice. In fact, the Notice expressly acknowledges that point reductions are available for short-term illnesses as well as scheduled medical appointments. (*See* Doc. 3-6 at 5 (employees "may seek to have absences for illness *or* scheduled medical appointments excused from the assessment of attendance points by providing medical documentation" (emphasis added)).

Manz e-mailed Defendant's General Chairmen on December 8, 2022 (prior to the Policy's implementation), in response to a question she received about "scheduled medical appointments." (Doc. 33-1 at 31). Manz answered that an "employee [who] *marks off sick* and goes to a doctor following *the mark off* and provides medical documentation" would not be assessed points and did not need to "pre-schedule[]" his appointment. (Doc. 33-1 at 31 (emphasis added)). Manz's was responding to confusion regarding "whether CSXT would continue excusing certain sick mark offs supported by sufficient medical documentation even though the new policy (like the old ones) did not expressly indicate that CSXT would do so." (Doc. 35-7 at 4). Manz's qualified yet affirmative answer was not meant to provide commentary on the definition of a scheduled medical appointment. It was also consistent with guidance Plaintiff provided Defendant and other unions.

**C. Virtual Medical Appointments**

The Attendance Policy is silent with respect to virtual medical appointments. In December 2022, Manz e-mailed Defendant's General Chairmen in response to a question about "scheduled medical appointments," to state that an "employee [who] marks off sick and *goes to a doctor* following the mark off and provides medical documentation" would not be assessed points, but that the appointment had to be in-person. (Doc. 33-1 at 31 (emphasis added)). Again, Manz was responding to confusion on how or whether Plaintiff would excuse points for absences and which category of absence this practice would apply to. In May 2023, Manz e-mailed Defendant's General Chairmen to memorialize an earlier discussion on the "remov[al of] attendance points for a mark-off." (Doc. 33-1 at 30–31). In that e-mail, Manz stated that Plaintiff "reverse[d] course on" the issue in February 2023 and had, since then, deemed virtual appointments to be acceptable.[4] (*Id.* at 30). Both of Manz's e-mails expressly refer to Plaintiff's policy or practice regarding mark-offs, and neither intended to define scheduled medical appointments.

**D. Ongoing Section 6 Mediations**

In the railway industry, CBAs are typically renegotiated on a rolling five-year basis in a mandatory process initiated by the service of a section 6 notice. *See* 45 U.S.C. § 156 (describing the process by which carriers and representatives may "change [] agreements affecting rates of pay, rules, or working conditions"). The parties' planned 2025 renegotiations were initiated in November 2024. Neither party has sought to amend

[4] To the extent that this statement provides an effective ex-post memorialization of the parties' earlier interpretation of the Policy, that interpretation is relevant to the parties' April and August 2023 CBAs, which adopted the Policy "subject to the terms for implementation, application, interpretation and intent as [contemporaneously] established by CSX." (Doc. 33-1 at 22; Doc. 33-2 at 11).

the CBAs with respect to the Attendance Policy. (*See generally* Def.'s Ex. 4). However, Defendant has proposed changes to Plaintiff's sick leave policy, at least with respect to the CBA governing Plaintiff's Northern Mid-Atlantic District. (*See generally* Def.'s Ex. 5). Plaintiff's sick leave policy, which was written into section 1 of the parties April and August 2023 CBA amendments, is distinct from its Attendance Policy, which was incorporated by reference in section 3 of the amendments.[5] (*See, e.g.*, Doc. 3-5 at 2–6). Notice 502 does not implicate Plaintiff's sick leave policy.

The parties' CBA negotiations are currently in mediation before the National Mediation Board.

**E. Self-Help Efforts**

On July 2, 2026, Lee initiated Defendant's internal procedures to obtain authorization for self-help. (Doc. 33-1 at 10). The parties agree that strikes, picketing, sick-outs, slow-downs, and other forms of economic force are considered "self-help" in the context of the RLA. (Doc. 1, ¶ 29; DA, ¶ 29). Lee previously exhausted his own self-help procedures and elevated the matter to Jeremy Ferguson, who has not yet approved a strike. (Doc. 33-1 at 10). Instead, Ferguson reiterated to Wall that Defendant would use every lawful means available to enforce the parties' existing status quo unless Plaintiff rescinded Notice 502 by July 15, 2026. Shortly before the deadline, Wall reengaged Ferguson to ask directly and, in Wall's words, "on the record," whether Defendant would strike in the event Plaintiff declined to rescind the Notice. Ferguson replied, "Absolutely." (*See* Doc. 1, ¶ 29; DA, ¶ 29). Wall perceived this as a clear indication of Defendant's

[5] Plaintiff's sick leave policy does not concern benefits provided by the Family and Medical Leave Act. (Doc. 3-5 at 3–4).

intent to strike, although Ferguson and another officer would still need to approve of it. The parties agree that if Plaintiff were to rescind the Notice, there would be no threat of a strike occurring. Should a strike occur, however, Plaintiff's operations would cease, significantly inhibiting other Class 1 railway operators and negatively affecting interstate commerce.

## III. LEGAL STANDARD

"The grant or denial of a preliminary injunction is within the sound discretion of the district court[.]" *Palmer v. Braun*, 287 F.3d 1325, 1329 (11th Cir. 2002). A district court may only grant injunctive relief if the moving party establishes: "(1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000). "In this Circuit, '[a] preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the burden of persuasion' as to each of the four prerequisites." *Id.* (quoting *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998)).

## IV. DISCUSSION

### A. Likelihood of Success

Courts classify labor disputes as either "major" or "minor . . . as a shorthand method of describing two classes of controversy Congress ha[s] distinguished in the RLA." *Consol. Rail Corp. v. Ry. Lab. Executives' Ass'n* ("***Conrail***"), 491 U.S. 299, 302 (1989). Plaintiff seeks an injunction pursuant to 45 U.S.C. § 153 First, which subjects

"minor disputes" to compulsory arbitration.[6] Defendant seeks an injunction pursuant to 45 U.S.C. § 156, which subjects "major disputes" to a longer process of mediation. The parties' respective likelihood of success depends on which type of dispute this case presents.

Major disputes occur when a carrier or representative "seeks to change 'agreements affecting rates of pay, rules, or working conditions.'" *Pro. Airline Flight Control Ass'n v. Spirit Airlines, Inc.*, 65 F.4th 647, 652 (11th Cir. 2023) (quoting 45 U.S.C. § 156). Thus, major disputes concern "the formation of collective agreements" and "arise [either] where there is no such agreement or where [a party attempts] to change the terms of one." *Conrail*, 491 U.S. at 302 (quotation omitted). Put differently, major disputes "look to the acquisition of rights for the future, not to assertion of rights claimed to have vested in the past." *Id.* (quotation omitted).

"In the event of a major dispute, the RLA requires the parties to undergo a lengthy process of bargaining and mediation." *Id.*; *see* 45 U.S.C. § 156; *Delta Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l*, 238 F.3d 1300, 1306 (11th Cir. 2001) ("[T]he RLA subjects all [major] disputes to virtually endless negotiation, mediation, voluntary arbitration, and conciliation." (quotation omitted)). Throughout this period, "the parties are obligated to maintain the status quo," meaning the carrier "may not implement the contested change

[6] In Count II, Plaintiff seeks an injunction pursuant to 45 U.S.C. § 152 First, which imposes on carriers and employees a duty to "settle all disputes . . . in order to avoid any interruption to commerce or to the operation of any carrier." Though §§ 152–153 plainly relate, Plaintiff's briefing appears more relevant to Count I. (*See generally* Doc. 13); *cf. CSX Transp., Inc. v. Bhd. of Maint. of Way Emps.*, 327 F.3d 1309, 1323 (11th Cir. 2003) (stating that "the institution of an illegal strike over a minor dispute violates . . . § 153, First," while the imposition of a "strike without notice to [the carrier] violates . . . § 152, First").

in rates of pay, rules, or working conditions." *Conrail*, 491 U.S. at 302–03. Nor may the carrier implement changes to other "working conditions and practices" that are "involved in or related to" the dispute if they were objectively in existence before the dispute arose. *Detroit & T. S. L. R. Co. v. United Transp. Union* ("***Shore Line***"), 396 U.S. 142, 153 (1969). If the carrier does effect such a change, the representative "is entitled to resort to self-help, i.e., [the] union can call a strike." *CSX Transp., Inc. v. Bhd. of Maint. of Way Emps.*, 327 F.3d 1309, 1320 (11th Cir. 2003). Alternatively, Courts may enjoin violations of the status quo "without the customary showing of irreparable injury," at least until the bargaining process ends, at which point "the parties may resort to the use of economic force." *Conrail*, 491 U.S. at 303.

Minor disputes "aris[e] out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions." 45 U.S.C. § 152 Sixth. Thus, minor disputes concern "the interpretation or application of [already existing] agreements concerning rates of pay, rules, or working conditions." *Conrail*, 491 U.S. at 303 (quotation omitted). Generally, then, while "major disputes seek to create contractual rights, minor disputes [seek] to enforce them." *Id.* at 302. In the event of a minor dispute, "the parties are prohibited from striking and must submit to compulsory arbitration of the dispute by the [National Railroad Adjustment Board ("**NRAB**")]." *CSX Transp.,* 327 F.3d at 1320. "[I]njunctive relief is the first resort of courts when a union and carrier come before the court with an impending illegal strike threatening to disrupt carrier service." *Id.* at 1327.

It follows that, if this case presents a major dispute, Plaintiff is not entitled to a strike injunction while the parties undergo the "virtually endless" mediation procedures

laid out in 45 U.S.C. § 156, though Defendant may be entitled to an injunction preserving the status quo without having to show irreparable harm. *Delta Air Lines*, 238 F.3d at 1305–06 (quotation omitted). If this case presents a minor dispute, Defendant is not entitled to a status quo injunction,[7] Plaintiff may implement the disputed policies, and Plaintiff may also be entitled to a strike injunction upon a sufficient showing of the traditional injunction factors.

"To an extent, . . . the distinction between major and minor disputes is a matter of pleading. The party who initiates a dispute takes the first step toward categorizing the dispute when it chooses whether to assert an existing contractual right to take or to resist the action in question." *Conrail*, 491 U.S. at 305. "Where an employer asserts a contractual right to take the contested action, the ensuing dispute is minor if the action is arguably justified by the terms of the parties' collective-bargaining agreement." *Id.* at 307. "[I]t is well established that the parties' practice, usage[,] and custom is of significance in interpreting [those terms]." *Id.* at 311. "Additionally, if a reasonable doubt exists as to whether the dispute is major or minor, [courts] will deem it to be minor." *CSX*, 327 F.3d at 1321 (quotation omitted). Therefore, the party "argu[ing] that a dispute is minor—typically the carrier—has only a 'light' burden of proof." *Spirit Airlines*, 65 F.4th at 653 (quoting *Conrail*, 491 U.S. at 307). In classifying a dispute as minor, courts do not find or even suggest that the carrier's interpretation is correct. *CSX*, 327 F.3d at 1322 (citing *Conrail*, 491 U.S. at 306). Rather, they determine only that the carrier's position is not "frivolous or [] insubstantial." *Conrail*, 491 U.S. at 307.

[7] There is an "extremely narrow" exception that the Court need not consider because Defendant does not argue that, in the event the parties' dispute is minor, it remains entitled to injunctive relief. *Spirit Airlines*, 65 F.4th at 652 (quotation omitted).

As a matter of pleading and consistent with contemporaneous assertions made to Defendant, Plaintiff asserts a right to implement Notice 502 consistent with the parties' CBAs. This position is arguably justified and is not frivolous and insubstantial. Under *Conrail*, therefore, this case presents a minor dispute. As an initial matter, however, the Court addresses the parties' ongoing CBA renegotiations.

In *Spirit Airlines*, the Eleventh Circuit remarked that it would be "easy" to classify a dispute as major where "either side has filed a section 6 notice proposing to amend an existing agreement or to establish a new agreement." 65 F.4th at 652. The *Spirit Airlines* parties had not submitted section 6 notices, however, and the court proceeded to analyze the dispute under *Conrail*'s uncontroversial framework. *Id.* at 653. The Eleventh Circuit handled the earlier dispute in *Delta Air Lines, Inc.*, where the parties *had* submitted section 6 notices, identically. 238 F.3d at 1307–08 & n.17. That is, after noting the "obvious inference" that the union pilots' collective refusal to pick up overtime shifts was meant "to pressure Delta into making concessions in the [ongoing] negotiations for a new CBA," the *Delta Air Lines* court nonetheless proceeded to classify the dispute by reference to the *Conrail* test. 238 F.3d at 1303. This Court will do the same, believing that the broad statement in *Spirit Airlines*, though certainly persuasive, is the kind of "general expression[]" that should "be taken in connection with the case in which [it was] used." *Cohens v. State of Virginia*, 19 U.S. 264, 399 (1821). The Court also finds it persuasive that most courts to squarely address the issue have agreed that the ongoing "renegotiation of [a] CBA does not automatically" transform what would otherwise be a minor dispute into a major one. *Airline Pros. Ass'n, Teamster Loc. Union 1224 v. ABX Air, Inc.*, 400 F.3d 411, 415 (6th Cir. 2005) (Batchelder, J.); *see Air Line Pilots Ass'n Int'l*

*v. E. Air Lines, Inc.*, 863 F.2d 891, 899 (D.C. Cir. 1988); *Ry. Lab. Execs. Ass'n v. Chesapeake W. Ry.*, 915 F.2d 116, 120 (4th Cir. 1990) ("The Achilles' heel of the Unions' argument is that the railroad's actions are 'arguably justified' by the *existing* agreement. The service of a § 6 notice and the beginning of bargaining over the proposed changes does not convert a minor dispute into a major one."); *Miklavic v. USAir Inc.*, 21 F.3d 551, 554–55 (3d Cir. 1994); *Int'l Ass'n of Sheet Metal, Air, Rail & Transp. Workers, Transp. Div. v. BNSF Ry. Co.*, 650 F. App'x 914, 916 (9th Cir. 2016).

Of course, if the disputed terms in Notice 502 were "involved in or related to" the ongoing CBA mediations between the parties, Plaintiff would be statutorily bound to maintain the status quo as to the disputed terms. *Shore Line*, 396 U.S. at 153. But to the extent Defendant has attempted to make such a showing, it has failed. And, as will be discussed below, while Defendant has provided extensive briefing on the RLA's status quo requirements, it has likewise failed to show that Notice 502 will do anything to upset the status quo as it exists under the still-effective CBAs relevant to this dispute. Moreover, Defendant did not raise the ongoing CBA negotiations in its formal objections to Notice 502. (*See* Doc. 33-1 at 36–49). Most importantly, Defendant fails to argue here that classification of this dispute can be resolved in its favor simply because (non-relevant) aspects of its CBAs are currently being mediated. The Court therefore proceeds to discuss the arguments Defendant has raised.

Defendant argues that Notice 502 changes Plaintiff's Attendance Policy (and thus the parties' existing CBAs) in three ways: (1) while the Policy provides that employees are not subject to discipline prior to accumulating sixty attendance points, the Notice allows for discipline regardless of an employee's point total; (2) while the Policy permits

employees to mark off from work for unscheduled medical visits, the Notice requires medical appointments to be pre-scheduled; and (3) while the Policy includes virtual appointments under the broader umbrella of scheduled medical appointments, the Notice does not.

With respect to attendance points, Plaintiff's Attendance Policy expressly requires the accumulation of sixty points prior to disciplinary action. But the Attendance Policy's point-assessment system is not Plaintiff's singular route to disciplinary action. Defendant concedes that Plaintiff has disciplined employees for dishonesty related to FMLA leave, even in cases where an employee did not accrue points for the absence. (Doc. 1, ¶ 19; DA, ¶ 19). The record demonstrates that other such cases concerned employees alleged to have dishonestly marked off as sick or to have taken leave not "for the approved medical reasons but rather as a way to avoid working when [they] did not want to." (Doc. 3-9 at 5; *see generally id.*). These disciplinary actions were not taken pursuant to Plaintiff's Attendance Policy, and they exhibit the existence of a standard that is eerily similar to that which is articulated in Notice 502. (*See* Doc. 3-6 at 11 ("Employees who incur excessive absences under suspicious circumstances, or patterns and degrees of unavailability that indicate abuse or misuse of CSX policies are subject to discipline up to and including dismissal regardless of accumulated points.")). It is therefore not frivolous to argue that the Notice's policy toward "excessive" or "suspicious" absences is justified by the terms of the parties' CBAs. After all, CBAs are interpreted in light of the parties' practice, usage, and custom—"the common law of a particular industry or of a particular plant." *Conrail*, 491 U.S. at 312 (quotation omitted).

Citing *Airline Professionals Ass'n, Teamsters Local Union No. 1224 v. ABX Air, Inc.*, No. C-1-00-536, 2001 WL 1842489 (S.D. Ohio Feb. 16, 2001), Defendant seems to argue that the parties' past practice should be discounted because the Policy's written terms disallow it. However, "[a] collective bargaining agreement is not [interpreted as] an ordinary contract for the purchase of goods and services," but rather "a generalized code to govern a myriad of cases which the draftsmen cannot wholly anticipate." *Conrail*, 491 U.S. at 311–12 (quotation omitted). Plaintiff has shown that it is not frivolous to argue that the written terms of its Attendance Policy do not, as a matter of custom, preclude it from disciplining employees over attendance- and availability-related abuses that fall outside of the Policy's point-based approach. In *ABX Air*, by contrast, the airline's newly implemented policy was "different in kind from the past changes" it had implemented, in part because it sought to impose a new rule of discipline. 2001 WL 1842489, at *4.

With respect to an absence resulting from an employee's scheduled medical appointment, the Attendance Policy expressly provides for a reduction of points subject to the employee's timely submission of certain records. (*See* Doc. 3-2 at 4). The Policy does not address when employees need to mark off from work to attend such an appointment. Notice 502 unremarkably provides that scheduled medical appointments are those that are "scheduled with the health care provider in advance of the mark off." (Doc. 3-6 at 8). Defendant argues that Manz's December 8, 2022 e-mail establishes that what the Attendance Policy refers to as "scheduled medical appointments" actually do not need to be pre-scheduled, but Manz's e-mail merely confirmed that Plaintiff's practice of excusing mark-offs would remain unchanged under the Attendance Policy. Notice 502 does not alter Plaintiff's longstanding policy of excusing mark-offs for short-term illnesses

and therefore it is not frivolous to argue that the Notice is consistent with or merely provides an interpretation of the Policy.

As to virtual medical appointments, the Attendance Policy is silent. In December 2022, Manz e-mailed Defendant's General Chairmen stating that an "employee [who] marks off sick and goes to a doctor following the mark off and provides medical documentation" would not be assessed points, but that the appointment had to be in-person. (Doc. 33-1 at 31). After the Policy was incorporated into one of the CBAs at issue here, and in response to a discussion on the "remov[al of] attendance points for a mark-off," Manz stated that virtual appointments had been deemed acceptable for several months. (*Id.* at 30–31). Defendant argues that this is inconsistent with Notice 502, which generally excludes virtual appointments from the category of scheduled medical appointments. However, Manz's later communication concerned mark-offs and did not mention or even respond to a question about scheduled medical appointments. It is therefore not frivolous to argue that Notice 502 provides an interpretation of the Policy with respect to scheduled medical appointments but does not effect a change to the parties' agreed-upon rules and working conditions.

In sum, Plaintiff has met its light burden of proof with respect to the disputes outlined above. Plaintiff's implementation of Notice 502 therefore presents a minor dispute, Defendant is prohibited from striking and, notwithstanding the provisions of the Norris-LaGuardia Act ("**NLGA**"), 29 U.S.C. § 101 *et seq.*, the Court has jurisdiction to enter an injunction necessary to prevent it from striking. *See Bhd. of R.R. Trainmen v. Chi. River & Ind. R.R. Co.*, 353 U.S. 30, 42 (1957); *CSX*, 327 F.3d at 1322. In the Court's July 15, 2026 Order and Temporary Restraining Order ("**TRO**," Doc. 18), the Court noted

that the NGLA's procedural provisions apply even where its jurisdiction-stripping provisions have been superseded by the RLA. (*Id.* at 6 (citing *Delta Air Lines*, 238 F.3d at 1310)). Defendant argues that in the event this case presents a minor dispute, Plaintiff is not entitled to injunctive relief because it has not satisfied 29 U.S.C. § 108, which requires "any complainant" seeking injunctive relief to first "make every reasonable effort to settle [its] dispute." However, "in minor disputes," § 108 merely "impose[s] a duty upon the railroad, short of negotiation, to take some reasonable steps toward dispute settlement before it can obtain an anti-strike injunction." *Ry. Exp. Agency, Inc. v. Bhd. of Ry., Airline & S.S. Clerks, Freight Handlers*, 437 F.2d 388, 394 (5th Cir. 1971) (quotation omitted).[8] Like the parties in *Railway Express Agency*, the parties here "g[ot] together with a sincere effort to resolve their differences, with each side explaining its position and listening to the contentions of the other side." *Id.*; (*see* Doc. 1, ¶¶ 23–27, 29; DA, ¶¶ 23–27, 29; *see generally* Doc. Nos. 3-10, 3-11, 3-12, 3-13). Plaintiff therefore satisfied the NLGA.

**B. Other Factors**

Defendant argues that the balance of harms and the public interest do not support injunctive relief. Regarding the balance of harms, Defendant argues that at the time the Court entered its July 15, 2026 TRO, it had not yet completed its internal procedures for instituting a strike, and therefore there was no immediate threat of a strike. However, Defendant admits that only two more officers need to approve of a strike before it occurs. There is no indication that those two approvals are, for some reason, difficult or time-

[8] Decisions of the Fifth Circuit issued on or before September 30, 1981, are binding upon the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

consuming to achieve. Defendant also argues that Plaintiff could have avoided the threat of a strike altogether by better explaining or rescinding the Notice. Defendant's assertion regarding a better explanation is not well taken. Plaintiff vigorously defends Notice 502 here as consistent with its Attendance Policy, and Defendant has shown no sign of accepting those representations. As to rescission, the Court will not find a threatened harm insufficient just because it could be avoided by giving in to Defendant's demands. Moreover, stating that the threat of a strike will cease upon recission of the Notice only reinforces the viability and likelihood of a strike if the Notice is not rescinded.

Defendant also emphasizes the potential harm to its members if Notice 502 is implemented. Defendant claims that the Notice will incentivize or force employees to show up sick for work, creating threats to both Plaintiff and the public. As the Court struggles to see how Notice 502 makes any changes to the existing Policy, including its practice of excusing points for mark-off absences, this fear is unfounded. The Court otherwise adopts the conclusions of its July 15, 2026 TRO with regard to irreparable injury, the balance of harms, and the public interest. (Doc. 18 at 9–11). The Court also concludes that the current bond provides adequate security.

## V. CONCLUSION

Accordingly, it is **ORDERED** and **ADJUDGED** as follows:

1. Defendant's Motion for Preliminary Injunction (Doc. 33) is **DENIED**.
2. Plaintiff's Renewed Time Sensitive Motion for Temporary Restraining Order and/or Preliminary Injunction (Doc. 13) is **GRANTED** as set forth in this Order and Preliminary Injunction.

3. The Court's July 15, 2026 TRO is converted into the following Preliminary Injunction entered as to Defendant SMART-TD:

**PRELIMINARY INJUNCTION**

For the reasons set forth above, it is **ORDERED** that Defendant SMART-TD, its divisions, lodges, locals, officers, agents, employees, members, and all persons acting in concert or participation with any of them, are hereby enjoined for the duration of this Order and Preliminary Injunction from authorizing, encouraging, permitting, calling, engaging in, or continuing any strikes, work stoppages, picketing, slowdowns, sickouts, or other self-help against Plaintiff or its operating rail subsidiaries over any dispute relating to the interpretation of CSXT's Attendance Policy and other aspects of System Notice 502.

Defendant SMART-TD and its national and local officers shall immediately initiate and undertake all reasonable efforts to prevent and discourage SMART-TD's divisions, lodges, locals, officers, agents, employees, members, and all persons acting in concert with any of them, from engaging in conduct enjoined by this Order and Preliminary Injunction, including but not limited to the following specific efforts:

1. Immediately instruct in writing all SMART-TD members employed by Plaintiff to refrain from self-help against Plaintiff, and provide Plaintiff with a copy of all such instructions;
2. Notify all SMART-TD members employed by Plaintiff by the most expeditious means possible of the issuance, contents, and meaning of this Order and Preliminary Injunction, and provide Plaintiff with a copy of all such notices;
3. Include in such notice a directive from SMART-TD to those SMART-TD members who are or may in the future engage in any conduct enjoined by this Order and Preliminary Injunction to immediately cease and desist all such

activity and to immediately cease and desist all exhortations or communications encouraging same upon pain of fine, suspension, or other sanction by SMART-TD;

4. Invoke union discipline and punish individual officers, agents, employees, or members who engage in any conduct enjoined by this Order and Preliminary Injunction;
5. Include copies of this Order and Preliminary Injunction in all SMART-TD publications, post it on all SMART-TD bulletin boards at Plaintiff's facilities, and transmit the contents of the ordering paragraphs on any recorded telephone hotlines, web sites, or other methods of electronic communication used by SMART TD to communicate with its represented employees;

**IT IS FURTHER ORDERED** that this Order and Preliminary Injunction is granted upon the condition that CSXT submit this dispute to compulsory arbitration by the National Railroad Adjustment Board on or before August 12, 2026. This Order and Preliminary Injunction will remain in effect for the pendency of the arbitration unless otherwise modified or rescinded by the Court. This case is **STAYED** pending arbitration, and the Clerk is directed to administratively close the case. CSXT shall notify the Court within fourteen days of a resolution.

**DONE AND ORDERED** in Jacksonville, Florida on July 29, 2026.

WENDY W. BERGER
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record